# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

     v.                           Case No. 07-CR-068

WILLIE LOTT, RYAN KING,
and CHARLES CONLEY,

        Defendants.

---

**RECOMMENDATION AND ORDER RE: DEFENDANTS' PRETRIAL MOTIONS**

---

## I. BACKGROUND

On March 13, 2007, a federal grand jury sitting in the Eastern District of Wisconsin returned a four count indictment against various individuals, including Willie Lott ("Lott"), Ryan King ("King"), and Charles Conley ("Conley"). The above-named defendants are not charged in each of the four counts. However, Count One of the indictment charges each of the above-named defendants with conspiracy to distribute controlled substances, i.e., 5 kilograms or more of a mixture and substance containing cocaine, and 50 grams or more of a mixture and substance containing cocaine base in the form of crack cocaine, both Schedule II controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. On April 5, 2007, Lott and King were arraigned and entered pleas of not guilty. On April 9, 2007, Conley was arraigned and entered a plea of not guilty. On August 21, 2007, Lott, King, and Conley were again charged in Count One of a superseding indictment with conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1),

841(b)(1)(A), and 846. On August 30, 2007, Lott, King, and Conley were arraigned and entered pleas of not guilty.

In accordance with the pretrial scheduling order, on September 30, 2007, Lott filed a motion to suppress "evidence seized from the defendant's apartment for the reason that the affidavit filed in support of the search warrant failed to establish probable cause," and a motion to "compel the government to identify confidential informants." On November 1, 2007, the government filed its response briefs. Lott did not file any replies. Thus, Lott's motions are now fully briefed and are ready for resolution.

On September 27, 2007, King filed a motion to dismiss the indictment together with a brief in support thereof. On November 1, 2007, the government filed its response brief. On November 26, 2007, King filed his reply brief. Thus, King's motion to dismiss is now fully briefed and is ready for resolution.

On October 1, 2007, Conley filed a motion to suppress identification of Conley by investigator David Shortess, and a request for an evidentiary hearing. On November 15, 2007, an evidentiary hearing was conducted with respect to the defendant's motion to suppress. Thereafter, the parties filed briefs in support of their respective positions on the issues raised by the defendant. Consequently, Conley's motion to suppress is now fully briefed and is ready for resolution.

For the reasons which follow, it will be recommended that Lott's motion to suppress be denied. Lott's motion to identify confidential informants will be granted in part and denied in part. It will be recommended that King's motion to dismiss be denied. And it will be recommended that Conley's motion to suppress be denied. Each motion will be addressed in turn.

2

## II. LOTT'S MOTIONS

### A. Lott's Motion to Suppress

Lott argues that the search warrant issued by the Racine County Circuit Court on April 6, 2007 was invalid because the "information contained in the affidavit filed [in] support of the search warrant application failed to set forth sufficient information to create probable cause to believe that contraband would be located in the premises on the day the warrant was executed." (Def.'s Mot. at 1.) Specifically, the defendant contends that the affidavit was primarily a boilerplate affidavit used to obtain numerous warrants on the same date, and that the information concerning drug dealing by the apartment's occupants was over two months old at the time of the application. (Def.'s Mot. at 1.)

My duty in reviewing this search warrant is limited. The duty of a reviewing court is simply to ensure that the judicial officer had a substantial basis for concluding that probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). Probable cause is a fair probability that contraband or evidence of a crime will be found in a particular place. *Id.* at 238. Probable cause exists when it is reasonably believed that the evidence sought will aid in the prosecution of a particular offense and the evidence is located in the place to be searched. *See United States v. McNeese*, 901 F.2d 585, 592 (7th Cir. 1990) *overruled on other grounds by United States v. Westmoreland*, 240 F.618 (7th Cir. 2001). "Probable cause denotes more than mere suspicion, but does not require certainty." *United States v. Fleischli*, 305 F.3d 643, 651 (7th Cir. 2002) (internal quotations omitted). "'In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and

prudent men, not legal technicians act.'" *United States v. Kimberlin,* 805 F.2d 210, 228 (7th Cir. 1986) (quoting *Brinegar v. United States,* 338 U.S. 160, 175 (1949)).

Probable cause is a fluid concept turning on the assessment of probabilities in a particular factual context. "Rather than viewing bits and pieces of a probable cause showing in isolation, the court must focus on all the facts presented to the magistrate." *United States v. Markling,* 7 F.3d 1309, 1317 (7th Cir. 1993). A search warrant may issue "even in the absence of [d]irect evidence linking criminal objects to a particular site." *United States v. Sleet,* 54 F.3d 303, 306 (7th Cir. 1995) (internal quotations omitted). "The [judicial officer] to whom the warrant application is directed is entitled to draw reasonable inferences about where evidence is likely to be kept based on the nature of the evidence and the type of offense, and the [judicial officer] need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *Id.* (internal quotations omitted).

A judicial preference is to be accorded warrants in those cases where there is a close or marginal showing of probable cause. In reviewing prior probable cause findings made by a judicial officer in issuing a warrant, "great deference is to be accorded to that determination." *United States v. Leon,* 468 U.S. 897, 914 (1984); *United States v. Pless,* 982 F.2d 1118, 1124 (7th Cir. 2002) (stating that "doubtful cases are to be resolved in favor of upholding the warrant"). The Seventh Circuit Court of Appeals has held that the standard of review of a determination that probable cause exists supporting issuance of a search warrant is "one of affirmance absent clear error by the issuing magistrate." *Pless,* 982 F.2d at 1124. Indeed, "[a] magistrate's determination of probable cause 'is to be given considerable weight and should be overruled only when the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances

4

from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated.'" *United States v. Newsom*, 402 F.3 780, 782 (7th Cir. 2005) (quoting *United States v. Spry*, 190 F.3d 829, 835 (7th Cir. 1999)).

Whether the search warrant issued by the Racine County Circuit Court on April 6, 2007 was supported by probable cause is a question that must be answered by examining the warrant application itself. The affidavit submitted in support of the warrant was signed by Agent Randal Kuzia of the Racine Police Department.

Lott's first argument is that, although Agent Kuzia's affidavit provides information about the typical activities of "large scale" drug dealers, the affidavit fails to provide a basis to believe that Lott was in fact a "large scale" drug dealer. In particular, Lott contends that the affidavit alleges that on January 3, 2007, Lott sold confidential informant (CI) #11 an unknown quantity of cocaine. According to Lott, the lack of knowledge regarding the quantity of cocaine makes it impossible to infer the degree to which Lott was involved in the drug trade. In addition, Lott argues that the claim by CI #12 that he knew that Lott was involved in a conspiracy to deliver drugs with Joey McClain and Joseph Stinson was a conclusion, and that probable cause cannot be based on such a conclusion.

Despite Lott's arguments, the existence of probable cause cannot be resolved entirely based on whether Lott was a "large scale" drug dealer. Rather, the affidavit must be read as a whole in a realistic and common sense manner in order to determine whether probable cause existed to believe that cocaine or other evidence of drug dealing would be found at Lott's residence. After reviewing the affdiavit as a whole, I am persuaded that the affidavit presented in support of the issuance of the search warrant for 5021 Byrd Avenue sets forth probable cause to believe that contraband or other evidence of a crime would be found at that residence. Indeed, the affidavit presented in support of

5

the search warrant averred the following: (1) Agent Kuzia had been investigating felony drug offenses for over fifteen years; (2) a controlled purchase of cocaine was made from Lott at his residence three months earlier by a reliable confidential informant; (3) another CI, one month after the first controlled purchase, advised Agent Kuzia that Lott was selling cocaine with Joseph Stinson out of Lott's apartment on Byrd Avenue in Racine, Wisconsin; (4) this CI had proven reliable in the past by supplying information that led to four search warrants and six felony arrests in the past twenty-four months; (5) police surveillance of Stinson confirmed the observations of the second CI; (6) a Title III wiretap was conducted between February 20 and February 26, 2007, and sometime between the date of Stinson's arrest on February 26, 2007 and the execution of the search warrant on April 4, 2007, Stinson confirmed the drug-related phone calls obtained during the wiretap, and indicated that he supplied Lott with cocaine for the past year on a weekly basis; and (7) Stinson reported, sometime between the date of his arrest on February 26, 2007 and the execution of the search warrant on April 4, 2007, that he had made cocaine deliveries to Lott's apartment on Byrd Ave. at least a dozen times over the past three months, and had most recently delivered cocaine to Lott at his Byrd Ave. address the week of February 19, 2007.

To be sure, the affiant could conceivably have set forth in more detail the amount of cocaine sold by Lott to CI #11. However, that one could conclude with hindsight that a search warrant application could have been more detailed does not render it insufficient. In the end, all that matters is that this court be satisfied that the judicial officer issuing the warrant had a substantial basis for concluding that, under the totality of the circumstances, probable cause existed to believe that contraband or evidence of the crime sought would be found in a particular place. *Gates*, 462 U.S. at 236. And this court is satisfied that such is the case.

6

First, although CI #11 did not state the exact amount of cocaine purchased from Lott, the CI did personally take part in a controlled purchase. Thus, the CI's information was based upon first-hand knowledge. CI #11 had also provided information to law enforcement over the past five years that had resulted in criminal arrests, and was therefore reliable. Moreover, CI #12 also informed Agent Kuzia of Lott's participation in the selling of cocaine with Stinson, and specified that the drug dealing was occurring at Lott's residence on Byrd Ave. This CI had also proven reliable in the past. CI #12 also reported that his knowledge was based on personal observations and conversations with Lott.

Furthermore, the observations of the CI's linking Lott to Stinson were corroborated by police surveillance of Stinson and a Title III wiretap, as well as by Stinson's identification of Lott as one of his primary customers. Stinson also reported selling cocaine to Lott on a weekly basis for the past year, including making at least a dozen deliveries to Lott's apartment over the past three months, with the most recent delivery occurring the week of February 19, 2007. Stinson, as an informant with first-hand knowledge and who, by admitting that he participated in drug transactions with Lott in the past made statements that were against his interests, was a reliable informant. *See United States v. Johnson*, 289 F.3d 1034, 1036 (7th Cir. 2002) (statements against penal interest by the CI offer an indicium of reliability).

Moreover, as noted by the Seventh Circuit, "it is appropriate to 'draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of the offense.'" *United States v. Ellis*, 499 F.3d 686, 690 (7th Cir. 2007) (quoting *United States v. Mykytiuk*, 402 F.3d 773, 778 (7th Cir. 2005)). "In the case of drug dealers evidence is likely to be found where the dealers live." *Id.* at 691 (quoting *Mykytiuk*, 402 F.3d at 778-79). Such being the

7

case, I am persuaded that the Racine County Circuit Court Judge had a substantial basis for concluding that, under the totality of the circumstances, there was a fair probability that law enforcement officers would find cocaine or drug-related paraphernalia at 5021 Byrd Avenue.

Lott's next argument is that there existed no probable cause for issuance of the search warrant because the information provided in the affidavit in support of the search warrant was stale. Specifically, Lott notes that the affidavit chronicles a controlled purchase of cocaine on January 3, 2007, and the search warrant was not issued until four months later, on April 6, 2007.

Age, or "staleness," is one piece of information that a judicial officer must consider when making a probable cause determination. "When considering whether information is stale, [the Seventh Circuit] has held 'that the age of inculpatory information is only one factor that magistrates should consider in determining whether probable cause exists, and if other factors indicate that the information is reliable the magistrate should not hesitate to issue the warrant.'" *Newsom*, 402 F.3d at 782-83 (quoting *Spry*, 190 F.3d at 836) (citations omitted). In other words, the age of the information is one matter that the judicial officer must consider in making the overall common-sense determination of whether it is probable that contraband or evidence of a crime will be found in a particular place.

To begin, I reiterate that my review of the Racine County Circuit Court Judge's probable cause determination is limited. Furthermore, given the standard of review, I am persuaded that the passage of time between the evidence of Lott's most recent receipt of cocaine and the issuance of the search warrant was not so long that it could no longer be said that there was a "fair probability" that evidence of Lott's alleged cocaine dealing would be found at his apartment. As an initial matter, although the controlled buy took place on January 3, 2007, the affidavit indicated that Lott last

8

received cocaine from Stinson the week of February 19, 2007.  Such being the case, the passage of time between Lott's most recent receipt of cocaine and the issuance of the search warrant was approximately 45 days, rather than four months.  The Seventh Circuit has noted that "at least one circuit has recognized that probable cause may be found 'several weeks, if not months,' after 'the last reported instance of suspect [drug-trafficking] activity.'"  *United States v. Lamon*, 930 F.2d 1183,1188 (7th Cir. 1992)  (quoting *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986)); *see also United States v. McNeese*, 901 F.2d 585, 597 (7th Cir. 1990) (finding probable cause despite a seven-month period between the informant's last drug pick-up and the issuance of the warrant).

Moreover, contrary to Lott's assertions, the affidavit does not simply describe one transaction on one occasion.  Rather, as noted above, sometime between the date of Stinson's arrest on February 26, 2007 and the execution of the search warrant on April 4, 2007, Stinson reported selling cocaine to Lott every week for the past year, including making at least a dozen deliveries to Lott's apartment over the past three months.   Furthermore, both CI #11 and CI #12 reported that Lott had been actively involved in cocaine sales with Stinson, and that Lott had been selling out of his apartment on Byrd Avenue.  As noted by the Seventh Circuit, "'where the affidavit recites facts indicating ongoing, continuous criminal activity, the passage of time becomes less critical.'"  *Lamon*, 930 F.2d at 1188 (quoting *United States v. Shomo*, 786 F.2d 981, 984 (10th Cir. 1986) (dicta); *see also United States v. Williams*, 897 F.2d 1034, 1039 (10th Cir. 1990) (in case involving long-term drug conspiracy, noting that "records, together with the fruits and instrumentalities of such an extensive criminal enterprise are likely to be present for some time"); *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988) ("By its very nature, drug trafficking, if unchecked, is apt to persist over relatively

9

long periods of time."). Indeed, Lott concedes that evidence of numerous transactions over an extended period of time may allow for the inference that drugs would still be in Lott's apartment, even four months later. Here, the affidavit provides information indicating that Lott had been continuously involved in drug transactions for about one year, with at least a dozen deliveries being made to Lott's apartment at Byrd Avenue.

Such being the case, and for all of the foregoing reasons, I am not persuaded that the Racine County Circuit Court committed clear error in issuing the search warrant for Lott's apartment. To the contrary, for the reasons set forth above, in my opinion, "based on the totality of circumstances, the affidavit set[] forth sufficient evidence to induce a reasonably prudent person to believe that a search [would] uncover evidence of a crime." *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2004).

Moreover, even if the search warrant were not supported by probable cause, the good faith exception applies. *See United States v. Leon*, 468 U.S. 897 (1984). *Leon* applies to a situation where a warrant was not supported by probable cause, but the executing officers proceeded in good faith reliance on what they believed to be a valid warrant. The government argues that, even if the search warrant was not supported by probable cause, the agents acted in objective good faith in executing the warrant, so that the motion to suppress should nonetheless be denied pursuant to *Leon*.

> In most cases [where an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope], there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.

10

*Leon*, 468 U.S. at 920-21 (citation and internal punctuation omitted).

Turning to the facts of this case, even if the search warrant were not supported by probable cause, the good faith exception would save it.

> An officer's decision to obtain a warrant is prima facie evidence that he or she was acting in good faith. A defendant may rebut this prima facie case by presenting evidence establishing either that: (1) the warrant issuing officer "wholly abandoned his judicial role" and failed to "perform his neutral and detached function," serving "merely as a rubber stamp for the police"; or (2) the affidavit submitted in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."

*United States v. Olson*, 408 F.3d 366, 372 (7th Cir. 2005) (internal quotations and citations omitted).

The defendant does not suggest, nor could I find, that the Racine County Circuit Court "wholly abandoned [its] judicial role" in this case and failed to "perform [its] neutral and detached function." *Id.* Rather, it appears as though the defendant is arguing that the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* However, as previously stated, I have already found that the warrant was supported by probable cause. Yet, even assuming the warrant were not supported by probable cause, "sufficient indicia of suspicion were present in the affidavit to invoke the good faith exception." *Id.* Specifically, as noted above, the affidavit established that (1) a controlled purchase of cocaine was made from Lott at his residence three months earlier by a reliable confidential informant, CI #11; (2) Lott was selling cocaine with Joseph Stinson out of Lott's apartment on Byrd Ave.; and (3) Stinson reported selling cocaine to Lott on a weekly basis for the past year, and making at least a dozen deliveries to Lott's apartment over the past three months, with the most recent delivery occurring the week of February 19, 2007. "Equipped with these assertions, the affidavit in support of the warrant to search [Lott's apartment] was not so lacking in indicia of probable cause as to render reliance upon it

11

unreasonable." *Olson*, 408 F.3d at 372. Consequently, and for all of the foregoing it will be recommended that Lott's motion to suppress be denied.

As a final matter, for a reason unknown to the court, the government has filed the search warrant affidavit under seal, but has filed along with the search warrant affidavit an order unsealing the search warrant. Unless the government shows cause as to why the affidavit should remain sealed, the government will be ordered to unseal the search warrant affidavit within five days of the date of this recommendation and order.

## B. Lott's Motion to Compel the Government to Identify Confidential Informants

Lott has moved the court for an order compelling the government to disclose the identities of CI #11 and CI #12. Lott asserts that these are CIs who claim to have been involved in the drug transactions giving rise to Count One of the indictment. Such being the case, the defendant asserts that these confidential informants are transactional witnesses. In response, the government asserts that, to the extent the government intends to call any of these confidential informants as witnesses in its case-in-chief, the government will disclose their identities three weeks prior to trial. Moreover, the government asserts that, to the extent the government does not intend to call any of these confidential informants as witnesses in its case-in-chief, the government will not disclose these informants' identities.

It is well-established that the government has a limited privilege to withhold the identity of a confidential informant from a criminal defendant. *Roviaro v. United States*, 353 U.S. 53, 60 (1957). "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their

Case 2:07-cr-00068-RTR   Filed 01/02/08   Page 12 of 30   Document 271

knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id.* at 59.

As established in *Rovario*, when determining whether to compel disclosure of an informant's identity, the court must balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62. Under this balancing test, the privilege will not apply "[w]here the disclosure of an informant's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused." *Id.* at 60-61. And, the burden is on the defendant to establish that disclosure is "relevant and helpful to [his] defense" or "essential to fair determination of a cause." *United States v. Jefferson*, 252 F.3d 937, 941 (7th Cir. 2001); *see also United States v. Bender*, 5 F.3d 267, 270 (7th Cir. 1993) (where the public interest in protecting the free flow of information is strong, the defendant must demonstrate a "genuine need" for disclosure). Furthermore, if a defendant meets this burden, the government's obligation to disclose the identity of the informant does not hinge on whether the witness will testify at trial. *See Banks v. Dretke*, 540 U.S. 668, 697 (2004).

To be sure, the government often seeks to maintain the anonymity of an informant out of a concern for his or her safety. This is especially true where the defendants have been charged with a drug-related offense. As the Seventh Circuit Court of Appeals noted in *United States v. Bender*: "Understandably, not many people want to become police informants in light of the violence within the drug subculture. Drug dealers are not known for treating informers with compassion." 5 F.3d at 270.

Moreover, "'[w]hen the informant is a mere tipster, rather than a participant or an eye witness to the event in question, disclosure will not be required.'" *Id.* (quoting *United States v. Andrus*, 775

13

F.2d 825, 842 (7th Cir. 1985)). In *Bender*, the Seventh Circuit held that the informant "was not a transactional witness, that is, he or she was not an active participant in the investigation leading to arrest." 5 F.3d at 270. Rather, the informant was a "tipster." Relying upon the fact that the "criminal activity the informant had witnessed did not constitute the charges against Bender," the court held that disclosure of the tipster's identity was not required. *Id.* If, however, the informant is "the sole participant, other than the accused, in the transaction charged," and "[is] the only witness in the position to amplify or contradict the testimony of government witnesses," the informant's identity must be disclosed. *Rovario*, 353 U.S. at 64; *see id*. at 55 (stating that the defendant in *Rovario* engaged in a one-on-one transaction with the informant, and thus, the informant "had taken a material part in bringing about the possession of certain drugs by the accused, had been present with the accused at the occurrence of the alleged crime, and might be a material witness as to whether the accused knowingly transported the drugs as charged").

Here, CI #11 participated in the alleged drug transactions giving rise to Count One. Thus, this informant is undoubtedly a transactional witness who will testify at Lott's trial, and the identity of this confidential informant is "relevant and helpful to [Mr. Lott's] defense." *Jefferson*, 252 F.3d at 941. As for CI #12, this informant allegedly made personal observations of Lott's drug transactions, and had conversations with Lott regarding his drug dealing. However, CI #12 did not take part in a drug transaction, and it is unclear if this is a situation, like *Roviaro*, where the informant was the only witness to the criminal conduct. It appears that CI #12 may have been a mere "tipster," who provided officials with information leading to the acquisition of the search warrant, but did not provide any specific information which formed the basis for the charges brought against Lott. Given the uncertainty as to whether CI #12's observations would be particularly significant to

14

Lott's defense, and recognizing that "the public has a strong interest in protecting the free flow of information in cases such as these and 'not many people want to become police informants in light of the violence within the drug subculture,'" CI #12's identity need only be disclosed if the government intends to call this informant as a witness at trial. *Jefferson*, 252 F.3d at 941.

The question that remains is when the government must reveal the identity of the confidential informants. In his motion, Lott seeks an order from the court requiring the government to reveal the identity of the confidential informants immediately. In response, the government proposes that it reveal the identity of the confidential informants three weeks prior to Lott's trial.

To be sure, the "open file policy" as defined in Crim. L.R. 16.1 does not include "material identifying confidential informants." *See* Crim. L.R. 16.1(c). But the open file policy does call for disclosure of "reports of interviews with witnesses the government intends to call in its case-in-chief relating to the subject matter of the testimony of the witness." Crim. L.R. 16.1(b). So there seems to be a bit of tension when it comes to the timing of the disclosure of confidential informants whom the government acknowledges will also be witnesses at trial. On the one hand, the government has a genuine interest in not revealing the identity of its confidential informants until absolutely necessary. Given that this is a narcotics case, there is a concern for the safety of informants, which weighs against the disclosure of the identity of the confidential informants. On the other hand, the simplest notions of due process require that a defendant must be given a reasonable time to prepare for trial.

All that having been said, I am persuaded that ordering the government to reveal the identity of CI #11, as well as the identity of CI #12 (if it intends to call CI #12 as a witness) three weeks prior to trial strikes the proper balance between the competing interests of defense counsel and the

15

government.  Accordingly, and for all of the foregoing reasons, Lott's motion to compel disclosure of the identity of confidential informants will be granted in part and denied in part.  More precisely, the government will be ordered to disclose the identity of CI #11 three weeks prior to trial.  The government will further be ordered to disclose the identity of CI #12 three weeks prior to trial, if it intends to call CI #12 as a witness at trial.

### III. KING'S MOTION TO DISMISS

King contends that, even viewing the undisputed facts contained in the discovery materials in the light most favorable to the government, the facts of the case do not amount to proof of his involvement in a conspiracy to distribute cocaine as alleged in Count One of the superseding indictment.   Specifically, King argues that the discovery materials do not suggest that King knew of the existence of the conspiracy, knew the purpose of the conspiracy, or ever delivered cocaine during the relevant time period between January 1, 2005 until March 13, 2007.

An "indictment . . . must be a plain, concise and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  An indictment must satisfy three requirements in order to be legally sufficient.  "First, the indictment must state all of the elements of the crime charged; second, it must adequately apprise the defendant of the nature of the charges so that he may prepare a defense; and third, it must allow the defendant to plead the judgment as a bar to any future prosecutions for the same offense."  *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000).  In assessing the sufficiency of an indictment courts are to review the document in its entirety, giving it a practical, rather than hypertechnical, reading.  *Id.*

In setting forth the offense, it is generally acceptable for the indictment to "track" the words of the statute itself, so long as those words expressly set forth all the elements necessary to constitute

16

the offense intended to be punished. *United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir. 1981). However, an indictment that tracks the statutory language can nonetheless be considered deficient if it does not provide enough factual particulars to "sufficiently apprise the defendant of what he must be prepared to meet." *Russell v. United States*, 369 U.S. 749, 763 (1962). In sum, "[f]acial sufficiency is not a high hurdle. Indictments need not exhaustively describe the facts surrounding a crime's commission nor provide lengthy explanations of the elements of the offense." *United States v. Bates*, 96 F.3d 964, 970 (7th Cir. 1996). "The defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *United States v. Agostino*, 132 F.3d 1183, 1191 (7th Cir. 1997).

King does not contend that the indictment is facially insufficient. Instead, King argues that Count One of the superseding indictment should be dismissed because the government cannot prove the essential elements of conspiracy to distribute cocaine. King contends that he is asking the Court to assess undisputed facts, and consequently make a legal determination that a conspiracy conviction can not be based on those undisputed facts. In support of this argument, King cites portions of the discovery material which he believes are relevant to his case, and contends that his summaries of this material are the undisputed facts of the government's case against King.

Federal Rule of Criminal Procedure 12(b) permits a party to raise pretrial motions which are capable of determination without trial of the general issue. *United States v. Yasak*, 884 F.2d 996, 1001 n.3 (7th Cir. 1989). "A defense generally is capable of determination before trial if it involves questions of law rather than fact. . . . If the pretrial claim is substantially intertwined with the evidence concerning the alleged offense, the motion to dismiss falls within the province of the ultimate finder of fact." *Id.* In effect, "a motion to dismiss an indictment is [ ] similar to a civil Rule

17

12(b)(6) motion, which tests the sufficiency of the underlying complaint (here the indictment)." *United States v. Pitt-Des Moines, Inc.*, 970 F. Supp. 1346, 1349 (N.D. Ill. 1997). Accordingly, "[f]or the most part, a motion to dismiss an indictment is not a vehicle for resolving whether the prosecution can ultimately prove its case." *United States v. Apple*, 927 F. Supp. 1119, 1121 (N.D. Ind. 1996); *see United States v. Shriver*, 989 F.2d 898, 906 (7th Cir. 1992) (court may not invade the province of jury by ruling as a matter of law on a disputed issue of fact); *United States v. Yasak*, 884 F.2d 996, 1001 n.3 (7th Cir. 1989) ("If the pretrial claim is substantially intertwined with the evidence concerning the alleged offense, the motion to dismiss falls within the province of the ultimate finder of fact."); *United States v. Romo,* 2007 WL 3026717, *2 (E.D. Wis. 2007) ("The jury must decide the inferences to be drawn from the evidence . . . Whether the evidence will be sufficient to prove defendant's guilt beyond a reasonable doubt is an issue for trial."); *United States v. DeLaurentis*, 230 F.3d 660, 661 (3rd Cir. 2000) ("Unless there is a stipulated record, or unless immunity issues are implicated, a pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence. . . . Federal Rule of Criminal Procedure 12(b)(2) authorizes dismissal of an indictment if its allegations do not suffice to charge an offense, but such dismissals may not be predicated upon the insufficiency of the evidence to prove the indictment's charges.").

Despite his arguments to the contrary, King's motion to dismiss the indictment raises mixed questions of law and fact which are not properly determined at this stage of the proceedings. King's claim ultimately involves a factual dispute, as the parties dispute the sufficiency of the evidence to prove a conspiracy, as well as the characterization of the facts themselves. The government does not agree with King that his synopsis of the discovery material represents the undisputed facts of the

18

case, or that the discovery material does not link King at all to the charged conspiracy. As such, King's claim that the evidence provided in discovery fails to establish the existence of a conspiracy is "substantially intertwined with the evidence concerning the alleged offense [such that] the motion to dismiss falls within the province of the ultimate finder of fact." *Yasak*, 884 F.2d at 1001 n.3.

In order to demonstrate the factual dispute between the parties, the government points out that King failed to provide all of the contacts between Stinson and King in the excerpts attached to his motion. The government notes that King's telephone, via a Title III authorization, was observed to call or receive calls from Stinson approximately nineteen times during the time Stinson's telephone was monitored by agents. Moreover, the government offers two specific examples, as an abbreviated proffer, of some of the evidence it intends to use against King at trial:

> A. On February 23, 2007, King called Stinson five times to effectuate what law enforcement believes to be a drug transaction. During that series of calls, King called Stinson at approximately 11:55 a.m. and said he was trying to "do both of them, the convertible and the hardtop." Case agents believe King and Stinson were using code to discuss King's request for crack cocaine (hard top) and powder cocaine (soft top). Stinson later called King at approximately and confirmed King's order, to which King replied, "hard top car, you can hold on to that." Stinson replied, "Just bring you the soft top?" King replied, "Yeah." Stinson then asked King if King wanted him to break them "all the way down to each seat." King did not attach either of these conversations to his motion.

> B. On February 24, 2007, Stinson called King at approximately 8:36 a.m., during which King asked Stinson, "You go that for me?" Stinson replied he did, and could have it ready for King by 10:00 a.m. that morning. King and Stinson then called each other five additional times, confirming their respective locations around the city of Racine . . . King attached the conversations between Stinson and King discussing their locations, but he failed to provide the conversation during which King confirmed his order with Stinson.

(Gov't Br. at 4-5; Ex. B.)

19

King concedes that he neglected to list certain contacts between King and Stinson due to the volume of the discovery material. Despite this concession, King contends that even given the additional wiretap facts cited to by the government, there is still no evidence that King knew of the conspiracy or actually delivered or attempted to deliver cocaine. Rather, according to King, there is only evidence that King received cocaine, and that he "*may be* used to deliver cocaine." (Def.'s Reply Br. at 5) (emphasis in original). However, this argument still relates to the sufficiency of the evidence, which is an issue for trial. It is the role of the jury to decide what inferences can be drawn from the evidence, and ultimately whether the evidence will be sufficient to prove the defendant's guilt. Consequently, and for all the foregoing reasons, it will be recommended that King's motion to dismiss be denied.

## IV. CONLEY'S MOTION TO SUPPRESS IDENTIFICATION

On November 15, 2007, an evidentiary hearing was conducted with respect to Conley's motion to suppress. Thereafter, the parties filed briefs in support of their respective positions on the issues raised by the defendant. Consequently, Conley's motion to suppress is now fully briefed and is ready for resolution. For the reasons which follow, it will be recommended that Conley's motion to suppress be denied.

### A. Factual Background

Two witnesses testified at the evidentiary hearing on November 15, 2007: Racine Police Investigator David Shortess and Drug Enforcement Agency Special Agent Jill Ceren. The following is a brief summary of the testimony offered at the evidentiary hearing conducted on November 15.

**David Shortess**

Racine Police Investigator David Shortess ("Shortess") testified that he has been an investigator for thirteen years, and has conducted surveillance on over one thousand occasions during those thirteen years. (Tr. 5 at 5.)

On February 24, 2007, at approximately 3:55 p.m., Shortess received information from Drug Enforcement Agency Special Agent Jill Ceren ("Ceren") in the "wire room" that a potential drug transaction involving Conley and Joseph Stinson ("Stinson") would likely occur at a Family Dollar Store in Racine, Wisconsin. This information was based on intercepted phone conversations. (Tr. at 15-16, 47.) Shortess parked his Chevy Astro minivan across the street and to the north of the parking lot of the Family Dollar store on Washington Avenue. The minivan was facing south. (Tr. at 16.) Shortess climbed into the middle seat of the second row bench seat of the minivan, and began his surveillance out of the windshield of the minivan. (Tr. at 17-19.) Shortess used Bushnell 10 x 50 binoculars, and observed Stinson's vehicle pull into the Family Dollar parking lot on the west side of the building. (Tr. at 23, 54.) Shortess' eyesight is 20/20 and 20/30 (Tr. at 92.)

A few minutes later, Shortess observed a Chevy Tahoe truck pull into the Family Dollar parking lot and park next to Stinson's vehicle. (Tr. at 25-26.) An unidentified male from the Chevy Tahoe entered the front passenger seat of Stinson's vehicle from the driver's side of the truck. (Tr. at 25-26.) Shortess could only observe that the subject was male, and based this observation on the subject's clothing. (Tr. at 26, 54.) After three to five minutes, Shortess observed the same subject exit Stinson's vehicle from the front passenger seat and return to the Chevy Tahoe. (Tr. at 26.)

Stinson's vehicle pulled out of the parking lot almost immediately after the subject exited Stinson's vehicle. The vehicle turned onto Russet Street, driving northbound toward Washington

21

Avenue. (Tr. at 26.) Shortess then observed the Chevy Tahoe back out of its parking slot, pull out of the parking lot, and also turn northbound onto Russet Street. (Tr. at 29.) Shortess was able to observe the Tahoe's license plate, and made note of it. (Tr. at 31.) The Tahoe then "almost immediately" pulled over to the curb on Russet Street, at the intersection of Russet and Washington Avenue. The truck apparently was experiencing mechanical trouble. (Tr. at 31, 56.) Shortess then observed the driver of the Tahoe exit the vehicle, walk toward the front of the vehicle, and lift the hood to look into the engine compartment. (Tr. at 30.) Shortess observed the subject's face as the subject was walking from the driver's side door to the front of the vehicle to open the hood. The subject exited his Tahoe and walked to the front of the vehicle a total of three times. (Tr. at 32-33, 69.) Shortess testified that he observed the subject's face three times for approximately two to five seconds each time the subject exited the vehicle and walked to the front to open the hood. (Tr. at 70.) The Tahoe driver was wearing a stocking cap that covered the top of his head and his hair. (Tr. at 68-69.) Shortess could not observe the subject's face once the hood was opened. (Tr. at 90-91.) Based on these observations, Shortess was able to describe the subject as "very skinny," with very prominent cheek bones and a little bit of facial hair or a beard. (Tr. at 32.) Shortess testified that he had no question as to what the subject looked like based upon his observations. (Tr. at 34.) The subject eventually closed the hood, entered the truck, and pulled away from the curb at Russet Street and Washington Avenue. (Tr. at 34.)

Shortess called Special Agent Ceren later that evening to inform her of the events of the day. (Tr. at 35.) Shortess was informed that the license plate of the Chevy Tahoe he had observed was registered to Conley. (Tr. at 36.) Shortess asked Ceren if she could provide him with a photograph of Conley for identification purposes, as he did not have a picture of Conley in his investigative

binder. (Tr. at 36.) Ceren agreed to e-mail Shortess a photograph of Conley, and did so within approximately fifteen minutes. (Tr. at 37.) Shortess testified that the photograph he received from Ceren via e-mail, which was a single booking photograph of Conley, was an accurate representation of the subject that he saw driving the Chevy Tahoe and meeting with Stinson. (Tr. at 40.)

In his report of the surveillance of that day (Ex. 3), Shortess does not indicate that the driver exited the vehicle three times. Shortess admitted that a reading of the report would give a person the impression that the driver only got out of the Tahoe on one occasion. (Tr. at 69.) The report did not include the Tahoe driver's height and weight, or his facial features. (Tr. at 68.) The report does include an estimate of the driver's age (between 45 and 46 years of age). (Tr. at 69.) Shortess testified that he "took a lot of notes . . . and making sure that I had everything written down . . . (Tr. 34.) Shortess later transferred these notes into his written report. (Tr. at 45.) Shortess testified that he was surprised that the report did not include the subject's height, weight, and build. (Tr. at 68, 83.)

Shortess testified that the purpose of the report, and of the surveillance, was to document his attempts to verify in the field what was being reported from the wire room. (Tr. at 75.) The report memorializes several events that occurred during the surveillance that did not involve Conley. (Tr. at 74.) The wire room did not request a physical description of the Tahoe driver. (Tr. at 74-76.) Shortess testified that, in general, one of the aims of surveillance is to identify the parties involved in any given case, which includes observing them, making notes on their appearance, and including a description in his report. (Tr. at 65-66.)

**Jill Ceren**

Special Agent Jill Ceren testified that she would have mentioned the name Eugene Nichols, along with Conley, when providing information to Shortess about the potential drug transaction at the Family Dollar store. (Tr. at 109-110.) Agent Ceren also testified that there would have been no impediment to pulling up other pictures and sending a group of pictures to Shortess. (Tr. at 113-114.)

### B. Discussion

Conley argues that the identification procedure used by Investigator Shortess was a violation of due process, and that Shortess' photo identification, as well as any attempt at in-court identification by Shortess, must be suppressed.

In determining whether an identification procedure was in violation of due process, the court conducts a two-step process. "First, the defendant must establish that the identification procedure was unduly suggestive." *United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007). Second, "[i]f the defendant establishes this factor, we then must determine whether, under the totality of the circumstances, the identification was nonetheless reliable." *Id*.

In order to establish the first prong, that the identification procedure was unduly suggestive, "the defendant must show both that the identification procedure was suggestive and that such suggestiveness was unnecessary." *Id*. The Seventh Circuit has noted that "many times [] a show-up identification, in which witnesses confront only one suspect, is inherently suggestive and should be employed only if compelled by extraordinary circumstances." *United States v. Newman*, 144 F.3d 531, 535 (7th Cir. 1998); *see also Stovall v. Denno*, 388 U.S. 293, 302 (1966) ("The practice of

24

showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned.").

In this case, the identification procedure used by Investigator Shortess was suggestive. Indeed, the government concedes that, at the very least, Investigator Shortess' procedure was potentially suggestive due to the fact that Shortess asked for, and knew he would receive, a photograph of Conley. (Gov.'s Br. at 6.) Moreover, Investigator Shortess had been informed prior to the commencement of his surveillance that Conley was likely to be involved in a drug transaction with Stinson at the Dollar Store. Prior to receiving the photographs of Conley, Investigator Shortess had also been informed that the Chevy Tahoe he had observed was registered to Conley. A single photograph display, in combination with Investigator Shortess' receipt of other information pointing towards Conley as the subject prior to his receipt of the photograph, sufficiently establish that the identification procedure was suggestive. *See United States v. Williams*, 999 F. Supp. 412, 414 (W.D.N.Y. 1998) ("Where no extenuating circumstances justify the procedure, the exhibition of a single photograph is considered unnecessarily suggestive.").

Furthermore, there is no indication that Investigator Shortess' identification procedure was compelled by extraordinary circumstances. Special Agent Ceren testified that there would have been no impediments to obtaining other pictures and sending a group of them to Investigator Shortess. The government concedes that there was no urgency in identifying Conley that evening, and that a photographic line-up could have been provided within a reasonable period of time when Investigator Shortess' memory was still fresh. (Gov.'s Br. at 6.) Such being the case, Conley has established that the identification procedure was unduly suggestive.

25

Given that the identification procedure was unduly suggestive, I must next consider whether, under the totality of the circumstances, Investigator Shortess' identification was nonetheless reliable. The United States Supreme Court has held that five factors must be considered when assessing whether an unduly suggestive identification was nonetheless reliable. These include: (1) the opportunity of the witness to observe the subject at the time of the crime; (2) the witness' level of attention; (3) the accuracy of the witness' prior description of the subject; (4) the level of confidence demonstrated by the witness at the confrontation; and (5) the length of time between the initial and secondary identifications. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

Here, Investigator Shortess observed the subject's face through his binoculars three times for intervals of between two to five seconds. To be sure, these intervals were brief, and were the only instances during the surveillance in which Investigator Shortess could observe the subject's face. However, Investigator Shortess' attention was focused solely on Conley during these intervals, and his observation of Conley's face was aided by the binoculars. Moreover, Investigator Shortess was not merely a lay witness, but rather an investigator experienced in surveillance who had conducted similar types of surveillance over a thousand times during the past thirteen years. As such, an analysis of the first and second *Biggers* factors supports a finding of reliability.

Conley questions whether Investigator Shortess did, in fact, view Conley's face at three separate times, given that Shortess' report gives the impression that Conley only stepped out of his vehicle once. However, there was nothing about the testimony of Investigator Shortess which leads me to believe that he was lying in any fashion. Investigator Shortess' testimony on both direct and cross-examination was consistent. Furthermore, Investigator Shortess did not hesitate to admit that he was unable to view Conley's face at any other times during his surveillance, including when

26

Conley was standing at the vehicle's hood, when he was in the parking lot, and when he was inside of his Chevy Tahoe. In my opinion, if Investigator Shortess needed to create a story to bolster his perceived ability to identify Conley, it seems highly unlikely that he would contend that he observed his face during two additional brief intervals, rather than contend that he was able to view his face at other times for far lengthier intervals. Moreover, although Investigator Shortess is an interested party in the sense that he does not want a prosecution undermined because of his error, he does not have a deep personal interest in the outcome of this particular case.

As to the third factor, Investigator Shortess accurately described Conley in his report and during his testimony at the evidentiary hearing. At the hearing, Investigator Shortess described Conley as being very skinny, with pronounced cheek bones and a little bit of facial hair or a beard. It is true that the report contains few details of Conley's physical features (only an estimate of Conley's age and a description of his clothing). Conley's height, weight, and build were not included in the report. However, the purpose of the report was not to provide sufficient detail with which to later identify Conley. Investigator Shortess testified that the report was to document his attempts to verify in the field what was being reported from the wire room, and indeed the report contains events during the surveillance not involving Conley. Moreover, the wire room did not ask Shortess to provide a physical description of Conley.

Given the paucity of details in the report, I cannot say that this third factor weighs heavily in favor of a finding of reliability. However, I am also unable to say that this lack of detail weighs heavily against the government in a *Biggers* analysis. Investigator Shortess' failure to memorialize the physical details of Conley in his report does not necessarily indicate that he was unaware of these details at the time he made his photo identification. Investigator Shortess may not have included the

27

subject's height, weight, and build in his report, but he almost certainly was aware of these details a few hours later when he identified Conley. Likewise, although Investigator Shortess did not describe facial hair or pronounced cheek bones in his report, given that Shortess observed Conley's face with binoculars, these are also details he likely would have been aware of at the time of the photo identification.

As to the fourth factor, Investigator Shortess stated with certainty at the hearing that the photograph he viewed later that evening was an accurate representation of the subject he observed at the scene on February 24, 2007, and at the hearing on November 15, 2007. Although this factor is not necessarily given much weight in a *Biggers* analysis, it nonetheless weighs in favor of a finding of reliability. *See United States v. Rogers*, 387 F.3d 925, 938 (7th Cir. 2004) ("where [the witness'] certainty is a product of the suggestive earlier identification . . . we are particularly skeptical.").

Lastly, as to the fifth factor, the length of time between the surveillance and the photo identification supports a finding of reliability. The lapse in time between Investigator Shortess' initial observations of Conley and his photo identification was approximately four to five hours. Indeed, Conley concedes that this time interval was relatively short and weighs in favor of the government.

After considering each of the five *Biggers* factors of reliability, I am satisfied that Investigator Shortess' identification was reliable. The totality of the circumstances indicate that Investigator Shortess, as an investigator experienced in surveillance, observed Conley's face directly through his binoculars for a sufficient period of time such that he could make a reliable photo identification a relatively short time later. Such being the case, it will be recommended that Conley's motion to suppress be denied.

28

**NOW THEREFORE IT IS RECOMMENDED** that defendant Lott's motion to suppress be **DENIED**;

**IT IS FURTHER ORDERED** that defendant Lott's motion to compel the identities of the confidential informants be **GRANTED IN PART AND DENIED IN PART**;

**IT IS FURTHER ORDERED** that the government disclose the identity of CI #11 three weeks prior to trial, and the identity of CI #12 three weeks prior to trial, if it intends to call CI #12 as a witness at trial;

**IT IS FURTHER ORDERED** that the government unseal the search warrant affidavit within five days of the date of this recommendation and order, unless the government shows cause as to why the affidavit should remain sealed;

**IT IS FURTHER RECOMMENDED** that defendant King's motion to dismiss the indictment be **DENIED**;

**IT IS FURTHER RECOMMENDED** that defendant Conley's motion to suppress be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(A) - (C), Federal Rule of Criminal Procedure 59(a) - (b), and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any order or recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation and order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance with the rules cited herein waives your right to review.

**SO ORDERED** this <u>2nd</u> day of January, 2008, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge